## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **JEAN LaROCQUE,** *by and through her appointed Power of Attorney, DEIDRE SPANG, on behalf of herself and all others similarly* situated**,** | ) ) ) ) ) | |
| | ) | |
| **PLAINTIFF** | ) ) | **No. 2:11-cv-91-DBH** |
| **v.** | ) ) | |
| **TRS RECOVERY SERVICES, INC. AND TELECHECK SERVICES, INC.,** | ) ) ) ) | |
| | ) | |
| **DEFENDANTS** | ) | |

## DECISION ON MOTION FOR CLASS CERTIFICATION

This is a motion for certification of four classes. The underlying claim is that the defendants' check collection procedures violate federal and Maine statutes regulating debt collection and unfair trade practices. I held oral argument on the motion May 3, 2012. After performing the "rigorous analysis" that <u>Wal-Mart Stores, Inc. v. Dukes</u>, ___ U.S. ___, 131 S. Ct. 2541, 2551 (2011), demands, I conclude that three of the four classes should be certified. The primary issues are commonality after <u>Wal-Mart</u> and the named plaintiff's adequacy as a class representative. (The defendants challenge her age, her financial acumen, and her standing.)

**FACTUAL BACKGROUND**[1]

Jean LaRocque is an 85-year-old[2] woman.  She lives independently in Kennebunkport, Maine, drives, shops, and pays some of her bills.  She has also given her daughter, Deidre Spang, a power of attorney to handle her financial affairs and reviews bill-paying with her once a week.

LaRocque independently purchased prescription medicine at a Rite Aid pharmacy in Kennebunk on March 2, 2010.  As was her custom, she paid with a paper check ($30.34) drawn on her credit union checking account.  She had more than sufficient funds in the account to cover the check, and the check cleared the account successfully on March 4, 2010.  At the time of the transaction, Rite Aid "scanned"[3] the check and sent relevant information electronically to the defendant TeleCheck Services, Inc.  TeleCheck provides electronic check processing services.  It advises Rite Aid and other merchants whether to accept a check, then guarantees a check whose acceptance it recommends.  By contract, TeleCheck requires a merchant using its services to post decals at points of sale.  The decals mention TeleCheck (but not its co-defendant, TRS Recovery Services, Inc.) and notify consumers of a $25 returned check fee that can be collected by drafts drawn on their bank

---

[1] I am aware of the heightened rigor that recent cases require and the need to make findings of disputed facts that are pertinent to class certification.  Here, however, the relevant facts are mostly undisputed.

[2] I take LaRocque's age from her deposition but also recognize that she may be a year older now.  Defs.' LaRocque Dep. 6:23, August 17, 2011 (ECF No. 45-5).

[3] A Fed. R. Civ. P.30(b)(6) deposition of the defendants' representative suggests that the check was only MICR-read, not actually scanned, although the representative eventually stopped resisting the LaRocque's lawyer's attempt to call it scanned.  Defs.' Sellen Dep. 81:15-86:13, Aug. 25, 2011 (ECF No. 45-1).

accounts.[4]   TeleCheck also requires the merchant to obtain the consumer's signature on a receipt that authorizes collection of the debt and a returned check fee by drafts on the consumer's account.   TeleCheck obtains from merchants like Rite Aid a contractual assignment of the merchants' rights against the check writers.   TeleCheck authorized LaRocque's paper check electronically at the time of her Rite Aid transaction.

On March 15, 2010, TRS, an affiliate of TeleCheck, wrote LaRocque an initial collection letter (the defendants call this the "RECR3 letter") stating that her check had been returned for "Non-sufficient funds."   The letter also said that TeleCheck had purchased the check and turned the debt over to TRS for collection.   The letter went on to say that LaRocque's original check ($30.34) had been resubmitted to her bank, and it demanded an additional $25 "returned check fee," which TRS said it would also present to LaRocque's bank as a draft.   The resubmitted $30.34 check then cleared LaRocque's account a second time on March 16, 2010—*i.e.*, LaRocque paid twice.   After LaRocque received this collection letter, her daughter wrote the defendants two letters signed by LaRocque, disputing the debt, and protesting TRS's collection efforts. Even though both of these letters provided LaRocque's credit union account statement—proving the original payment—the defendants continued to treat

---

[4] LaRocque provides examples of two TeleCheck decals, which are the most likely to be used in Maine.   Defs.' Model Decals at 2, 3 (ECF No. 43-11); Pl.'s Mem. at 9 (ECF No. 43).   Both of these decals indicate that TeleCheck will collect a $25 "return fee" from a consumer's account. Defs.' Model Decals at 2, 3.   One of the decals—the one less likely to be displayed at a Rite Aid store—indicates that "costs" will also be collected.   Defs.' Model Decals at 2; Pl.'s Mem. at 9.

LaRocque as if she had bounced the original check.[5]  In addition to the duplicate payment, TRS collected the $25 fee by draft from LaRocque's credit union account as well.  The defendants subsequently refused to refund the overpayments.  As a result of her experiences, LaRocque, through the power of attorney to her daughter, filed this class action lawsuit against TeleCheck and TRS.  LaRocque challenges their check collection procedures as contrary to federal and Maine statutes.  Only after she filed the lawsuit did the defendants confess error and offer to refund her overpayments.  Mem. Law Opp'n Pl's Mot. Class Certification and Req. Oral Argument at 1 (ECF No. 44); Pl.'s Reply Br. Further Supp. Her Mot. Class Certification at 1 (ECF No. 51).

ANALYSIS

LaRocque has requested certification of four classes:

1. All people in Maine to whom, since March 11, 2010, TRS has sent an initial dunning letter substantially similar to the RECR3 letter.[6]  For this class, the claim is that the letter is misleading and deceptive and violates both the Federal Debt Collection Practices Act (FDCPA) and the Maine Debt Collection Practices Act (MDCPA).[7]  On this claim,

---

[5] In response to the first of her letters, one of the defendants' employees phoned LaRocque and reiterated that they would not waive the returned check fee.  Evidence of Defs. Collection Efforts at 6 (ECF  43-15); Defs.' Sellen Dep. 164:1-13; Spang Dep. 15:12–17, Aug. 17, 2011 (ECF No. 45-4).  LaRocque explained that she would have her daughter call the defendants back to discuss the issue.  Evidence of Defs. Collection Efforts at 6.  The record does not reveal whether Spang did, indeed, return the call or simply chose to write.  The date on LaRocque's second dispute letter is March 25, 2011, the day after the defendants' phone call.  Pl.'s Mar. 25, 2010 Letter (ECF No. 43-14).

[6] The period is one year preceding the filing of the Complaint.  This is the period allowed by the applicable statute of limitations.  15 U.S.C. § 1692k(d).

[7] The parties agree that I should interpret the federal and state statutes identically.  See Sweetland v. Stevens & James, Inc., 563 F. Supp. 2d 300, 303 (D. Me. 2008).

LaRocque seeks statutory, not actual, damages for the class.   Pl.'s Mem. Law Supp. Her Mot. Class Certification at 24 (ECF No. 43); Oral Argument Tr. 7:1-2, May 3, 2012 (ECF No. 55).

2.   All people in the United States and its territories to whom, since March 11, 2010, TRS has sent an initial letter substantially similar to the RECR3 letter and from whom at least one of the defendants has collected any funds within 30 days of that communication  For this class, the claim is that the defendants' collection activities during the 30 days following the letter amount to illegal "overshadowing" of the consumer's right to challenge the debt under the FDCPA.   15 U.S.C. § 1692g(b).   LaRocque seeks both statutory and actual pecuniary damages for the class on this claim.[8]

3.   All people in the United States and its territories whose paper checks were processed electronically and from whom at least one of the defendants has, since March 11, 2010, recovered a second payment by re-presenting the paper check to the drawer's bank.  For this class, the claim is that the defendants' recovery of the duplicative collection payments violated the FDCPA.   LaRocque seeks actual pecuniary damages for the class on this claim.

4.   All people who have paid the defendants' returned check fee by way of a TRS draft in connection with an underlying check transaction that

---

[8] LaRocque has disclaimed any emotional distress damages for all of the classes.   Oral Argument Tr. 7:19-21.

occurred in Maine since March 11, 2005.[9]  For this class, the claim is that a Maine statute prohibits collecting such a fee without a 10-day notice period, which these defendants did not provide, and that, in any event, TRS had no authority to collect any such fee.  LaRocque seeks money damages, restitution, and injunctive relief for the class on this claim.

All four classes are damages classes.[10]  I proceed to assess, therefore, whether each of the four proposed classes satisfies the criteria of Federal Rules of Civil Procedure 23(a) and 23(b)(3).[11]

---

[9] Maine has a six-year statute of limitations for such a claim.  14 M.R.S.A. § 752.

[10] The plaintiff requests Rule 23(b)(2) injunctive class status for Class 4—but only if I deny Rule 23(b)(3) status.  Pl.'s Mem. at 36.  Since I find that the proposed fourth class satisfies the Rule 23(b)(3) damages class requirements, there is no need to consider it further under Rule 23(b)(2).  The complaint also makes Fair Credit Reporting Act claims, but the motion makes no claim for class certification under that statute.

[11] Rule 23(a) states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b)(3) states:

> A class action may be maintained if Rule 23(a) is satisfied and if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

**A.**    <u>**Class 1**</u>**:  *Maine Recipients of the Allegedly Misleading and Unlawful First Letter***

This proposed class is: All people in Maine to whom, since March 11, 2010, TRS has sent an initial dunning letter substantially similar to its RECR3 letter.

### *Numerosity, Fed. R. Civ. P. 23(a)(1)*

It is undisputed that the members of this proposed class number 748 people.  That number satisfies the Rule's numerosity requirement.

### *Commonality, Fed. R. Civ. P. 23(a)(2)*

The claim for Class 1 is that TRS's RECR3 letter is "misleading and unlawful" under both federal and Maine statutes.  Specifically, LaRocque complains first that the letter says that TRS will create a paper draft and submit it to the consumer's bank.  According to LaRocque, TRS has no authority to do so, and TRS's means of collection are deceptive and unfair. Pl.'s Reply Br. at 4; Pl.'s Mem. at 20.  Second, LaRocque complains that TRS's letter refers to "any applicable state tax" without enumerating what the amount of that state tax is,[12] contrary to the statutory requirement that "the amount of the debt" be revealed in such a letter.  15 U.S.C. § 1692g(a)(1).  The defendants' depositions reveal that the RECR3 letter is a form letter and that they have standard and uniform procedures for sending it out.  Pl.'s Hossler Dep. 55:12-62:10, August 24, 2011 (ECF No. 43-5).  Thus, the legality of the letter's contents and its use presents a common issue.  If the contents and use are

---

[12] In fact, there is no applicable state tax for Maine.  Mem. Law Opp'n Pl's Mot. Class Certification and Req. Oral Argument at 21 (ECF No. 44).

legal, this part of the lawsuit is over.  If the contents and use are illegal, then there are statutory damages to be assessed.

The defendants argue that their authority to create and present drafts on consumers' bank accounts will vary consumer by consumer, merchant by merchant, and transaction by transaction—all depending on what notices the merchants posted, what signatures they obtained, and what individual consumers knew and understood.  Pl.'s Mem. at 37.  Tuttle v. Equifax Check, 190 F.3d 9 (2d Cir. 1999), examined the authority issue for the FDCPA, which permits a service charge only if "such amount is expressly authorized by the agreement creating the debt or permitted by law."  15 U.S.C. § 1692f(1).  Tuttle relied on FTC Staff Commentary to elaborate.  Specifically:

> If state law expressly permits service charges, a service charge may be imposed even if the contract is silent on the matter;
> If state law expressly prohibits service charges, a service charge cannot be imposed even if the contract allows it;
> If state law neither affirmatively permits nor expressly prohibits service charges, a service charge can be imposed only if the customer expressly agrees to it in the contract.

190 F.3d at 13.  The parties seem to agree that Maine law neither affirmatively permits nor expressly prohibits service charges and that the third contingency applies.  Tuttle relied on the FTC Staff Commentary to conclude that, on the third contingency, an express agreement to pay a service charge can occur without a written agreement.  "For example, [a debt collector] may collect a service charge on a dishonored check based on a posted sign on the merchant's premises allowing such a charge, if he can demonstrate that the consumer

knew of the charge." Id. at 15 (quoting Staff Commentary).  In Harrell v. Checkagain, LLC, 248 F.R.D. 199, 207 (S.D. Miss. 2006), the court denied class certification for such a claim because there were too many individualized issues, "including the issue of whether an agreement authorized the charge or whether the charge was permitted by law due to a point-of-sale notice."

Here, the decals and receipts that TeleCheck required of merchants disclosed the returned check fee.  The decals also mentioned TeleCheck.  The defendants argue that, as in Harrell, it will be an individualized question as to whether any particular consumer expressly agreed under the FTC standard to grant authority for collecting a returned check fee from the consumer's account, and that the answer will vary based on what the consumer saw and/or read in this and previous transactions.  Tuttle said that was a jury question, 190 F.3d at 15, and according to Harrell, the question is too individualized to permit class certification.  248 F.R.D. at 207.  Accord Still v. JBC Associates, P.C., No. Civ. 02-3550(RBK), 2005 WL 1334715, at *3 (D.N.J. June 3, 2005).

But LaRocque's claim is that even with the notices, signed receipts, and consumers' knowledge and understanding at the point-of-sale transaction, use of the RECR3 letter is still contrary to law.  Right or wrong, that narrow claim is a uniform claim that satisfies commonality.  LaRocque also says that her lack of authority claim derives from the fact that TRS—as distinguished from

TeleCheck—is never mentioned in the point-of-sale notices[13] and, therefore, that TRS cannot engage in these collection efforts at all. Oral Argument Tr. 14:12–15:13. That, too, is a uniform and common issue for the class. Answering the questions of authority and legality will satisfy Wal-Mart's commonality requirement. The final issue—whether mentioning a possible tax while failing to enumerate the *amount* of that tax satisfies the statutory requirement that the debt be correctly stated—likewise satisfies commonality.[14]

The defendants argue that Wal-Mart, in its focus on the late Professor Nagareda's insight ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation"[15]) has made it impossible for the proposed classes here to satisfy commonality. I disagree. It is the plaintiff's right to frame the theory of her

[13] This assertion appears to be undisputed.

[14] The defendants argue that LaRocque lacks standing on this claim because she did not have to pay a state tax. Mem. Law Opp'n at 21. Texas is perhaps the only state that charges a tax. Oral Argument Tr. 47:10-12. But this is a Maine statewide class, not a national class, and LaRocque has standing to make the argument for the class of Maine people who (she claims) could not determine the total amount of their debt from the form letter. Because there is no applicable tax in Maine but there is reference to "any applicable state tax," LaRocque says that the letter is "misleading and confusing," and that it fails to state the total amount of the debt, leaving the debtor to wonder whether more is due than the dollar figure stated in the collection letter. That claim is common regardless of the point-of-sale experience. The plaintiff draws on the "least sophisticated debtor" standard and cases where debt collectors failed to disclose the amount of accruing interest. See, e.g., Jones v. Midland Funding, LLC, 755 F. Supp. 2d 393 (D. Conn. 2010); Miller v. McCalla Raymer, 214 F.3d 872, 875 (7th Cir. 2000); Welker v. Law Office, 699 F. Supp. 2d 1164, 1167 (S.D. Cal. 2010) ("least sophisticated debtor" will interpret such a notice as "stating only a part of the debt owed"). But see Curtis v. Palisades, No. 07–CV–529(S), 2011 WL 5196708, at *8 (W.D.N.Y. Oct. 31, 2011) (finding that a letter not mentioning interest was not deceptive because the defendants did not seek interest.) I am not now ruling on the merits of the claim, only that it is uniform and common.

[15] 131 S. Ct. at 2551, quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132. There is a strong argument that applying the Nagareda quotation to the commonality inquiry takes it out of context. See Robert H. Klonoff, The Decline of Class Actions, 90 Wash. U. L. Rev. (forthcoming 2013), 34-35. Nevertheless, I follow the Supreme Court's interpretation of the Rule.

lawsuit and choose her claims, and an answer to whether the uniform RECR3 letter is illegal—despite the notices, receipts and understandings at point of sale—will drive the resolution of the litigation on this claim and meet the Wal-Mart standard of commonality.[16]   Although Wal-Mart rejected an employment discrimination class on commonality grounds, the Supreme Court also reminded us that earlier, in General Telephone Co. of Southwest v. Falcon, 457 U.S. 147 (1982), it had said that commonality would "clearly" be satisfied if the challenge was to a particular testing procedure that an employer used for applicants and employees.   Wal-Mart, 131 S. Ct. at 2553.   Here, and analogously, the challenges are to a particular letter and procedure that the defendants use uniformly for consumers who present checks at point-of-sale transactions.   Wal-Mart commonality is satisfied.

---

[16] Earlier caselaw reached the same conclusion.  See, e.g., Garland v. Cohen & Krassner, No. 08–CV–4626(KAM)(RLM), 2011 WL 6010211, at *5 (E.D.N.Y. Nov. 29, 2011) (certifying FDCPA settlement class and finding commonality where the "central issues . . . are whether the defendant mailed substantially similar or materially identical letters and whether those letters violated the FDCPA"); Zimmerman v. Portfolio Recovery Assocs., LLC, 276 F.R.D. 174, 179 (S.D.N.Y. 2011) (finding commonality for FDCPA class where "all members of the proposed class received a substantially similar 'Pre-Suit Package' from Defendant"); Gordon v. Corporate Receivables, No. 09-230S, 2010 WL 376386, at *2 (D.R.I. Jan. 27, 2010) (finding commonality when the question was whether "a standardized, form debt collection letter on its face" violated the FDCPA) (albeit no defense appearance and therefore presumably no adversarial presentation); Ayzelman v. Statewide Credit Servs. Corp., 238 F.R.D. 358, 363 (E.D.N.Y. 2006) (FDCPA) ("where the central legal question in the case is whether Statewide sent substantially similar collection letters that contained language in violation of the FDCPA, there are common issues sufficient to satisfy the requirement of Rule 23(a)(2)"); Maxwell v. Arrow Finan. Servs., LLC, No. 03 C 1995, 2004 WL 719278, at *3 (N.D. Ill. Mar. 31, 2004) (class certification under the Maine Fair Debt Collection Practices Act) ("Courts consistently have found a common nucleus of operative facts if a defendant has allegedly directed standardized conduct toward the putative class members or if the class claims arise out of standardized documents."); Ballard v. Equifax Check Servs., Inc., 186 F.R.D. 589, 595 (E.D. Cal. 1999) (FDCPA class) ("A common nucleus of operative fact is typically found where 'defendants have engaged in standardized conduct toward members of the proposed class by mailing to them allegedly illegal form letters or documents.'").

### *Typicality, Fed. R. Civ. P. 23(a)(3)*

LaRocque received the RECR3 letter, the legality of which she contests. The defendants challenge her typicality nevertheless because they concede—now—that she never bounced a check and should not have received the letter, and assert that they have a bona fide error defense to the fact that they over-collected.[17]   They argue that LaRocque's deposition reveals that her real grievance is that they failed to recognize that her check cleared properly, that they obtained payment on it a second time, and that they charged her their $25 bounced check fee unjustifiably.   But as the plaintiff, LaRocque is free to determine what claims she is making, and her claim here is that the RECR3 letter, which she received, is itself misleading and deceptive, regardless of whether a consumer's check bounced and fees were collected.[18]   That claim is typical of the class LaRocque seeks to represent.   I see no reason why she may not challenge the collection procedures generally, even though the circumstances of her case—she never bounced the check—may be egregious.

### *Fair and Adequate Representation, Fed. R. Civ. P. 23(a)(4)*

### *(a) Lawyers*

The defendants make no challenge to LaRocque's lawyers' ability to give fair and adequate representation to the class.   Nevertheless, I address that topic because Rule 23(g) has focused on it since 2003.   Also, as some courts

---

[17] Actually, their bona fide error defense applies only to the claim asserted by proposed class 3.
[18] The defendants also argue that there will be a consumer-by-consumer argument as to which consumers agreed at point of sale to collection of the returned check fee by draft.   But as I describe in text at p. 9, the plaintiff is proceeding on the premise that the consumer class saw the decals and/or received the receipt, and she challenges the assertion that those documents gave TRS (as distinguished from TeleCheck) any rights.

recognize, the adequacy of counsel is often far more important than the adequacy of a named plaintiff—especially given the complexities of class action litigation and the nature of the sometimes small economic stakes for any individual consumer plaintiff.  Culver v. City of Milwaukee, 277 F.3d 908, 910 (7th Cir. 2002).

LaRocque's Philadelphia lawyers, James A. Francis and John Soumilas of Francis & Mailman, P.C., have pursued this action since its early stages. The record shows that they have extensive experience in class action lawsuits and that they are well-versed in the laws of debt collection.  Similarly, their filings show that they have already committed significant resources to prosecuting this case.  Local counsel, Jon Hinck and Kevin Fitzgerald of Lewis Saul & Associates, P.C., are admitted to the Maine bar and likewise have abundant class action experience, as I know from another case[19] in this court. I find that the plaintiff's attorneys satisfy the requirements of Rule 23(g), and I conclude that, as class counsel, they will fairly and adequately represent the interests of the class.

### (b) Named Plaintiff

The defendants do challenge Jean LaRocque's ability to be a class representative.  Their challenge is as follows:

---

[19] In re Hannaford Bros. Co. Customer Data Sec. Breach Litig., MDL No. 2:08-MD-1954 (D. Me. 2008).

First, LaRocque's involvement in the lawsuit has been too minimal to qualify her as an adequate representative.  Mem. Law Opp'n at 24.

Second, LaRocque cannot be responsible for protecting the class because she does not independently manage her own financial affairs.  Id.

Third, LaRocque's granddaughter has been a paralegal at the Philadelphia law firm seeking appointment as class counsel, and thus, LaRocque cannot be trusted to monitor or challenge the firm's actions on behalf of the class in the way that an unrelated representative plaintiff would.  Mem. Law Opp'n at 25-26.

The First Circuit has said that this part of the adequacy inquiry— whether the named plaintiff herself is adequate—is satisfied if her interests do not conflict with the interests of any class members.  Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985).  Therefore, I first address LaRocque's granddaughter's role at the plaintiff's law firm.[20]  The granddaughter has now graduated from law school, left the law firm in Philadelphia, and moved to Massachusetts to start her own legal career and family.  At oral argument, the plaintiff's lawyer, as an officer of the court, assured me that there is no ongoing financial relationship between the firm and the granddaughter and no financial

---

[20] If a class representative has a familial relationship with class counsel, is an employee of counsel, or is economically dependent on counsel, a court may find that the relationship disqualifies the plaintiff from serving as an adequate representative.  See Kirby v. Cullinet Software, Inc., 116 F.R.D. 303, 309-10 (D. Mass. 1987).

14

reward tied to this case.  Mem. Law Opp'n at 25; Oral Argument Tr. at 32; <u>see also</u> Spang Decl. (ECF No. 51-1).  Aside from her granddaughter's role at the law firm, now no longer germane, LaRocque has no conflicts of interest with the members of the proposed classes that she seeks to represent.[21]

But the <u>Andrews</u> case is somewhat dated, and commentators have criticized courts for narrowing the adequacy standard to merely an absence of conflicts.[22]  <u>See, e.g.</u>, Robert H. Klonoff, <u>The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement</u>, 2004 Mich. St. L. Rev. 671, 678-79 (2004).  Some say that appellate courts now "are increasingly applying a more rigorous analysis" and requiring trial courts "to make a more searching inquiry into that issue."   Bruce Braverman, <u>The "Adequate Representative" Requirement Gains Some Teeth</u>, 12 Class Action Litig. Rep. 945 (2011).

I therefore proceed to consider other criteria, including LaRocque's knowledge of the facts and the law, her age and abilities, her integrity, her willingness to be involved in the case directly or through her daughter, and the actions that she has taken to date.  As I recount in a later footnote, cases and

---

[21] Thus, the case is not like <u>London v. Wal-Mart Stores, Inc.</u>, where the lawyer and the named plaintiff shared not only a previous financial relationship but also a "long-standing personal friendship."  340 F.3d 1246, 1255 (11th Cir. 2003).  The circuit court said in <u>London</u> that a "close" friendship created "a *present* conflict of interest."  <u>Id</u>.  Meanwhile, the risk that the friends might resume their former stockbroker/client relationship after the litigation finished created a "*potential* conflict of interest."  <u>Id</u>.  Together, these "very close" personal and financial ties hindered the named plaintiff in fairly and adequately representing the class.  <u>Id</u>.

[22] That narrow focus on absence of conflicts in assessing the named plaintiff's adequacy may find some support in recent Supreme Court language.  In <u>Wal-Mart Stores, Inc. v. Dukes</u>, ___ U.S. ___, 131 S. Ct. 2541 (2011), the Court quoted language from <u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147 (1982):  Together, both cases say that the adequacy of representation criterion "raises concerns about the competency of class counsel and conflicts of interest."  131 S. Ct. at 2551 n.5; 452 U.S. at 157-58 n.13.

commentators are neither uniform on what the criteria should be nor helpful in explaining when or why those criteria are pertinent.

LaRocque herself engaged in the Rite Aid transaction that generated the defendants' debt collection efforts. LaRocque herself took delivery of the defendants' RECR3 letter and was embarrassed at what the "mail lady" must have thought when she saw the envelope identifying the sender. Defs.' LaRocque Dep. 30:2-31:11, July 27, 2011 (ECF No. 45-5). LaRocque was intensely aggrieved—"very distraught," "panicked," "shook," "scared," "aghast," "scared . . . to death"—by how the defendants' treated her at the time. Spang Dep. 14:24–15:17, Aug. 17, 2011 (ECF No. 45-4); Defs.' LaRocque Dep. 7:15-7:19, 30:6-32:3. Thus, she knows the facts of what happened to her; she pursued the matter through her daughter (who has her power of attorney), first, out-of-court;[23] and then, only when that effort was unsuccessful, she sought this legal redress. Although she is 85 and has some problem with remembering dates, LaRocque still drives and shops. Defs.' LaRocque Dep. 13:7-14:4; Spang Dep. 23:10-24:8. She testified at her deposition in this case and described her grievances with how the defendants treated her. Defs.' LaRocque Dep. 29:13–34:10.[24] On LaRocque's behalf, her daughter collected documents for the lawsuit. Defs.' LaRocque Dep. 36:4–36:13. Her daughter also testified at a deposition. See Spang Dep. LaRocque has rejected the

---

[23] With her daughter's assistance, LaRocque wrote letters to the defendants before she filed the lawsuit. See Pl.'s Mar. 20, 2010 Letter (ECF No. 43-13); Pl's Mar. 25, 2010 Letter. She also took one of their phone calls. See note 5 supra.

[24] See Pope v. Harvard Bancshares, Inc., 240 F.R.D. 383, 391 (N.D. Ill. 2006) (listing "appearing for depositions" and "knowing the obligations of his role" as methods by which a proposed representative can demonstrate commitment to a case).

defendants' post-complaint offer that they would make her whole without requiring her to forego her own personal lawsuit.  No one has impugned the integrity of either LaRocque or her daughter.  LaRocque was a schoolteacher during her working years, and her daughter is "a schoolteacher with no criminal record."  Defs.' LaRocque Dep. 13:13–14:9; Pl.'s Reply Br. at 10.

LaRocque is now relying upon her daughter to pursue her interests in the lawsuit.  But like the Supreme Court in <u>Surowitz v. Hilton Hotels Corp.</u>, 383 U.S. 363, 372 (1966),[25] I see no problem in LaRocque allowing her daughter to pursue the details of the lawsuit through a power of attorney, and there is no suggestion that the daughter has any conflict of interest now that LaRocque's granddaughter has severed ties with the law firm.  LaRocque does not know the law of debt collection practices (nor did I until I read the statutes, regulations, and cases in dealing with this motion).  What is important is that LaRocque does fully know the facts of her grievance; she is committed to the class action (not dissuaded by the defendants' offer to her); she  is using her daughter, through a power of attorney, to pursue the details; and she has engaged qualified counsel to represent her and the class.  Certainly, LaRocque's age and physical condition should not disqualify her, given the

---

[25] In <u>Surowitz v. Hilton Hotels Corp</u>., 383 U.S. 363 (1966), the Supreme Court allowed a derivative action to proceed where the named plaintiff was "a Polish immigrant with a very limited English vocabulary and practically no formal education," <u>id</u>. at 368, "did not understand the complaint at all, . . . could not explain the statements made in the complaint, . . . had a very small degree of knowledge as to what the lawsuit was about, . . . did not know any of the defendants by name, . . . did not know the nature of their alleged misconduct, and . . . in signing the verification . . . had merely relied on what her son-in-law had explained to her about the facts in the case."  <u>Id</u>. at 847-48.  The Supreme Court found it quite understandable that the plaintiff should rely on the advice of her son-in-law, who was an expert in financial matters.

assistance that her daughter provides through the power of attorney.   See Surowitz.

To support their position, the defendants cite Gunter v. Ridgewood Energy Corp., 164 F.R.D. 391, 396 (D.N.J. 1996), in which an 80-year-old woman—with very little personal involvement in the securities purchase at issue in that case—was disqualified from serving as the class's sole representative.[26]   But here, LaRocque *was* personally involved. She wrote the check, presented it to Rite Aid, received the dunning letter and later phone call, and had amounts taken out of her checking account.   She was *the consumer* involved in the transaction.   The defendants also cite Pope v. Harvard Bancshares, Inc., 240 F.R.D. 383, 390 (N.D. Il. 2006).   There, in evaluating the would-be representative plaintiff, the court examined the integrity and credibility of the plaintiff's son-in-law, who held her power of attorney and had a significant influence on her decision-making with regard to the case.   The son-in-law had been convicted of willfully filing false federal income tax records for himself and for his corporation.   Id.   He had also testified in a related case that he and his partners made up a false story to conceal their wrongdoing.   Id. The Pope court ruled that the class representative was inadequate because her son-in-law was "not the best choice for a fiduciary who must honestly look out for the best interests of absent class members instead of attempting to

---

[26] The Gunter court did rule that the woman, along with her niece (who held the woman's power of attorney and was a separate plaintiff) and a third woman, could serve as a group of named plaintiffs.   Gunter v. Ridgewood Energy Corp., 164 F.R.D. at 396.

maximize his own." Id.  LaRocque's role as personal representative and that of her daughter here are unlike either Gunter or Pope.

Unfortunately, there is no established set of criteria for qualifying or disqualifying a person to serve as a class representative.[27]  When some member of the class has a significantly larger stake than others, it often makes sense to appoint that plaintiff as class representative because of the incentives that person or entity has to achieve a successful outcome and monitor the class lawyers' performances.   That is the approach Congress took in the Private

---

[27] Beyond the attention to conflicts in the older cases like Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985), (and the recent Wal-Mart reference, see note 22 supra), Professor Klonoff suggests that "[a] non-exclusive list of factors would include: lack of basic knowledge about the claims and progress of the case; failure to supervise counsel; ethical violations, lack of honesty, or other misconduct; and the representative's ability or willingness to participate meaningfully in the proceedings."  Robert H. Klonoff, The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement, 2004 Mich. St. L. Rev. 671, 697-98 (2004).  See also Robert H. Klonoff, Class Actions and Other Multi-Party Litigation in a Nutshell § 3.7, at 54-60 (3d ed. 2007) [hereinafter Klonoff, Nutshell] (noting that some of these components are rarely used but discussing vigorous prosecution; knowledge of the case; honesty, good character and credibility; lack of conflicts; absence of unique defenses; ability to finance the class action; and membership in the class).  Newberg on Class Actions says that courts have looked at "the proposed representative's knowledge of the case; of her duties as class representative; the proposed representative's credibility or integrity; the proposed representative's financial resources; the relationship between the representative and class counsel; and the proposed representative's physical condition."   William B. Rubenstein, Newberg on Class Actions § 3:66 (5th ed. 2011).  But Newberg also recognizes that "courts now uniformly hold that the financial resources of the proposed representative are irrelevant to the adequacy inquiry" and that "[m]ost courts reject challenges to adequacy based on the physical condition of the proposed class representative." Id. § 3:69, :71.  Braverman says that the cases examine whether the named plaintiffs:  lack standing; lack a cognizable claim; face unique defenses to their claim; have a conflict of interest; lack credibility, judgment, and/or knowledge about the case; or display a lack of vigor.  Bruce Braverman, The "Adequate Representative" Requirement Gains Some Teeth, 12 Class Action Litig. Rep. 945 (2011).

     As a practical matter, when—as here—individual recovery in a class action is likely to be small, the role of the representative plaintiff is likewise small.  There is little incentive for such a class representative to play the involved, lawyer-monitoring, role that courts and commentators would prefer.  Instead, the onus in such cases falls on the lawyers and the court.  At the end of the day, it is difficult to articulate the necessary qualities for a named plaintiff in a consumer class action where the likely individual recovery is small.  Like it or not, small individual recovery consumer cases are driven by the lawyers, and monitoring rests with the court. It may not be a happy outcome, but realistically, that is what class action practice amounts to in consumer cases.

Securities Litigation Reform Act, and commentators endorse this approach when it is available.  See Am. Law. Inst., Principles of the Law of Aggregate Litigation § 1.05(e), at 59 (2010).  But they also recognize that the approach is typically not available in consumer class actions, where every class member's stake is small.  Id.  ("In many class actions, claim size varies too little to affect the choice of lead plaintiff.  This is true, for example, when all represented persons' claims are small."  Id.[28])  Unlike a securities law case, the issue in a consumer class action is not which party will lead the lawsuit but whether the lawsuit will proceed at all.  Here, as in many proposed class actions, there is no suggestion that another representative is waiting in the wings, and the defendants' challenge is designed to halt the class action—not to ensure that the best plaintiff is leading the class.[29]  I conclude that the named plaintiff here, Jean LaRocque, can fairly and adequately represent the class with the assistance of her daughter, as power of attorney, and the professional advice of the law firm that she has selected.  The situation here is fairly parallel to Surowitz but for the fact that this is a class action rather than a derivative action.[30]

---

[28] "[M]any aggregate proceedings, such as consumer-protection class actions, contain persons who lack the litigation experience needed to monitor lawyers effectively.  Many aggregate lawsuits also involve solely or mainly persons whose claims are too small to justify the expense monitoring entails. . . .  [T]he private cost of monitoring may exceed the expected private return."  Principles of the Law § 1.05 (Comment i), at 74.

[29] I do recognize the principle that the defendants are entitled to ensure adequacy of representation so that, if they obtain a favorable judgment, it cannot be challenged on due process grounds.  Klonoff, Nutshell § 3.7, at 52-53 (3d ed. 2007).  But instances of such successful challenges are few and far between, and here I am satisfied that LaRocque and her lawyers can adequately represent the class.

[30] I also have "a continuing duty to monitor the adequacy of the class representatives and class counsel."  Klonoff, Nutshell § 3.7, at 51.  That duty derives from due process:  "the Due Process
*(continued next page)*

I address one other issue on adequacy that the defendants have not raised expressly. It is apparent that LaRocque—or more bluntly, her lawyers—have strategically chosen which claims to pursue and which arguments not to make. Some courts have criticized that strategic behavior and disqualified a class representative accordingly. See, e.g., McClain v. Lufkin Industries, Inc., 519 F.3d 264, 283 (5th Cir. 2008). But commentators have argued persuasively that this is legitimate behavior by a class representative, designed to maximize the success of the class recovery. See Robert H. Klonoff, The Decline of Class Actions, 90 Wash. U. L. Rev. (forthcoming 2013), 37-43; Edward F. Sherman, "Abandoned Claims" in Class Actions: Implications for Preclusion and Adequacy of Counsel, 79 Geo. Wash. L. Rev. 483, 503 (2011) ("Paring down a class action so that it can be certified should not in itself be considered inadequate representation. It is often in the interests of the class members to do just that, particularly where there is little likelihood, in the absence of a class action, that class members can and will pursue the claims in individual suits."); accord Sullivan v. Chase Inv. Services, Inc., 79 F.R.D. 246, 258 (N.D. Cal. 1978) (Renfrew, D.J.) ("The fact that counsel have not tried to press claims against CIS which they believe (and justifiably so) are unsuitable for class treatment does not make them inadequate. To the contrary, that is the proper course for them to take.") The First Circuit has not spoken to the issue, but I am satisfied that, when called upon to do so, the

---

Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985), citing Hansberry v. Lee, 311 U.S. 32, 42-43 (1940).

First Circuit will find the commentators' arguments persuasive.  Moreover, the First Circuit has said that there is no res judicata (claim preclusion) effect on class members for claims that were not advanced.  <u>Cameron v. Tomes</u>, 990 F.2d 14, 17 (1st Cir. 1993).  Thus, class members are not prejudiced by the strategic behavior here to ignore certain potential claims.[31]

### *Predominance, Fed. R. Civ. P. Rule 23(b)(3)*

The legality of the RECR3 letter—whether it was "misleading and unlawful" in saying what TRS would and could do and in its reference to "any applicable tax"—predominates over any questions affecting only individual class members.  The statutory standard—the least sophisticated consumer—is objective,[32] and thus, there is no need to look at individual class members' understandings of the letter.  The defendants' focus on the varying factual circumstances of each point-of-sale transaction and what contract emerged therefrom is misplaced because the plaintiff is willing to accept the fact that the defendants' notices were given and seen.  She claims that there is liability regardless.  Moreover, only statutory damages are requested.[33]  As a result, the questions of law and fact common to class members predominate.

---

[31] This is not a Rule 23(b)(2) class from which class members cannot opt out, a situation that provoked the Supreme Court's concern in <u>Wal-Mart</u> that a (b)(2) class action that did not make compensatory damage claims might preclude future individual actions for compensatory damages.  131 S. Ct. at 2559.

[32] <u>See</u> <u>Russell v. Equifax A.R.S.</u>, 74 F.3d 30, 34 (2nd Cir. 1996); <u>Lerner v. Forster</u>, 240 F. Supp. 2d 233, 237 (E.D.N.Y. 2003) ("The prevailing standard used by courts to determine whether a defendant has violated the FDCPA is well-established: the standard is objective and is based on how the 'least sophisticated consumer' would interpret language contained in the debt collection letter itself.")

[33] The federal statute provides that, in the case of a class action, a debt collector is liable for the sum of:  (1) any actual damage sustained by the individual consumer; (2) additional damages not to exceed $1,000 for each named plaintiff; (3) an additional amount for all other *(continued next page)*

### *Superiority, Fed. R. Civ. P. 23(b)(3)*

It is true that the FDCPA and the MDCPA provide statutory damages and attorney fees to a successful plaintiff.  See 15 U.S.C. § 1692k(a); 32 M.R.S.A. § 11054(1)(A).  Plaintiffs in these contexts, therefore, do not necessarily require class action lawsuits in order to be able to satisfy small individual claims.  But the statutes also explicitly recognize that there will be class actions and provide damage limitations for them.  See   15 U.S.C. § 1692k(a)(2)(B); 32 M.R.S.A. § 11054(1)(C).   Considering the factors that Rule 23(b)(3) lists for the superiority assessment, I find that, for what will be small consumer recoveries, the class members have minimal interest in controlling the prosecution of their individual cases (subsection A); I am aware of no litigation concerning the controversy already begun by class members (subsection B); it is desirable to concentrate the litigation of the claims in one forum—and in this Maine forum, where LaRocque's transaction occurred (subsection C); and there are no insurmountable difficulties in managing a class action (subsection D).  Fed. R. Civ. P. 23(b)(3).  (Indeed, given the way that the plaintiff has framed her claim, there is likely to be little—perhaps no—factual dispute, because the issue involves interpreting a uniform letter according to an objective standard.)

It is therefore appropriate to certify the first proposed class.

---

class members not to exceed the lesser of $500,000 or 1 percent of the debt collector's net worth; and (4) attorney fees and costs.  15 U.S.C. § 1692k(a).  In a class action case, the MDCPA provides for the sum of: (1) any actual damage sustained by the named plaintiff; (2) an amount as the court may allow for all other class members not to exceed the lesser of $500,000 or 1 percent of the net worth of the debt collector; and (3) attorney fees and costs.  32 M.R.S.A. § 11054(1)(C).

**B.**   <u>**Class 2**</u>**:  The Overshadowing Class**

This proposed class is:  All people in the United States and its territories to whom, since March 11, 2010, TRS has sent an initial letter substantially similar to its RECR3 letter and from whom at least one of the defendants has collected any funds within 30 days of that communication.

*Numerosity, Fed. R. Civ. P. 23(a)(1)*

It is undisputed that the members of this proposed class number 107,600 people.  That satisfies the numerosity requirement.

*Commonality, Fed. R. Civ. P. 23(a)(2)*

The claim for Class 2 involves the same RECR3 letter as Class 1.  In this case, however, the proposed class extends to everyone in the United States and its territories to whom TRS sent the letter—if and only if one of the defendants also collected funds from those consumers within 30 days.  The substantive claim here is different from that of Class 1 and is called an "overshadowing" claim.

The FDCPA requires that a debt collector notify a consumer debtor:

> of the amount of the debt;
>
> of the name of the creditor;
>
> that, unless the consumer disputes the validity of the debt or a portion of it within 30 days, the debt will be assumed valid;
>
> that, if the consumer does notify the debt collector in writing during the 30 days that the debt is disputed, the debt collector will obtain verification of the debt and provide it to the consumer; and

> that, upon the consumer's request during that same
> period, the debt collector will provide the consumer
> with the name and address of the original creditor.

15 U.S.C. § 1692g(a).   Collectively, this information is sometimes called the validation notice.  The statute goes on to say that "[a]ny collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor."  15 U.S.C. § 1692g(b).  According to caselaw, "[a] notice overshadows or contradicts the validation notice 'if it would make the least sophisticated consumer uncertain as to her rights.'"  Jacobson v. Healthcare Fin. Servs., Inc., 516 F.3d 85, 90 (2d Cir. 2008) (quoting Russell v. Equifax A.R.S., 74 F.3d 30, 34 (2nd Cir. 1996)).

LaRocque claims that the defendants' activity here—sending the consumer a validation notice while simultaneously resubmitting the consumer's check to the bank and then, fourteen days later, submitting a draft for an additional $25 fee—violates the prohibition against overshadowing the consumer's right to dispute the debt.  Pl.'s Mem. at 26.  The defendants strenuously reject that assertion.[34]  However, there is no disagreement that the

---

[34] The statute specifies that "[c]ollection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period" unless the consumer notifies the debt collector of a dispute or requests the name and address of the original creditor.  15 U.S.C. § 1692g(b).  If the consumer does make such a dispute or request, "the debt collector shall cease collection of the debt" until the debt collector mails to the consumer either a verification of the debt or the information on the original creditor.  Id.  There is some caselaw on overshadowing.  The cases generally involve whether a lawsuit—or the threat of one— improperly overshadows the 30-day notice.  See, e.g., Ellis v. Solomon & Solomon, P.C., 591 F.3d 130, 135 (2d Cir. 2010) (finding that, where the defendant first sent the debtor a validation notice and then—during the validation period—served the debtor with a summons and complaint, the lawsuit overshadowed the notice if it did not clarify "that commencement of the lawsuit has no effect on the information conveyed in the validation notice"; also *(continued next page)*

defendants use a standard letter and that their collection activities are uniform—namely, that they resubmit the dishonored check for payment as they mail the RECR3 letter and that, about fourteen days thereafter, TRS presents a draft to the consumer's bank for the $25 fee.  Id.; Mem. Law Opp'n at 5.

The defendants say that the overshadowing claim nevertheless fails commonality.  They say that some people who pay by check authorize these collection efforts by their conduct in proceeding with the transaction after they see a decal or sign a receipt that refers to TeleCheck and the $25 check collection fee.  The defendants say, therefore, that each transaction will have to be examined separately to determine what each individual consumer knew and authorized.  But the plaintiff says that her claim is based on the statute, that overshadowing is prohibited regardless of the point-of-sale factual variations, and that any authorization for TeleCheck (as contrasted with TRS) is beside the point.[35]  Pl.'s Reply Br. at 15.  Again, I conclude that the plaintiff can choose

---

emphasizing that the validation period "is not a grace period" and that, "in the absence of a dispute notice, the debt collector is allowed to demand immediate payment and to continue collection activity"); Federal Home Loan Mortg. Corp. v. Lamar, 503 F.3d 504 (6th Cir. 2007) (finding no overshadowing when a creditor filed a lawsuit and included the debtor's validation notice at the beginning of the complaint itself).  See also Sims v. GC Servs., LC, 445 F.3d 959, 962, 965 (7th Cir. 2006) (finding no overshadowing in the text of a dunning letter that printed the validation notice on its reverse side  and stated that the debtor would "continue collection efforts until the matter is resolved."); Bush v. Loanstar Mortgagee Servs., LLC, 286 F. Supp. 2d 1210, 1215 (N.D. Cal. 2003) ("A debt collector is not required to wait until the end of the 30-day period to take action to collect a debt.  15 U.S.C. § 1692g(b).  Therefore, a debt collector can declare a debtor to be in default and elect to sell the security for the loan within the 30-day period without violating the FDCPA.").

[35] The plaintiff claims that nowhere—not in any document nor at any point-of-sale transaction—was the defendant TRS identified or authorized to do anything.  This assertion does not appear to be disputed; any TRS authority apparently comes from an assignment from its affiliate, TeleCheck.

the nature of the claim that she will make; and, as so framed, the issue of the legality of the letter, its mailing, and TRS's automated collection practices meet the <u>Wal-Mart</u> commonality standard.   <u>See</u> <u>Durham v. Continental Central Credit</u>, No. 07cv1763 BTM(WMc), 2010 WL 2776088 (S.D. Cal. July 14, 2010) (commonality for overshadowing claim).

However, I do accept the defendants' contention that the plaintiff's proposed Class 2 is overbroad.  Mem. Law Opp'n at 21-22.  In her filings and at oral argument, the plaintiff has stressed that her Class 2 legal argument rests on the fact that TRS simultaneously mails the RECR3 letter, helps itself to the underlying debt, and puts in motion what will likely be, two weeks later, an automatic withdrawal of the additional $25 fee.  It is the plaintiff's contention that these immediate collection efforts deprive consumers of any meaningful right to dispute the debt.  The defendants are correct in stating that the plaintiff's proposed definition of this class might unfairly include consumers who owe multiple debts to the defendants and who settle an earlier debt during the 30-day validation period of a second one.  That hypothetical consumer would fall within the class definition, but the transaction would not illustrate the claim LaRocque is making.  Thus, LaRocque will need to modify her definition of this proposed class.[36]

---

[36] I do not accept the defendants' other contentions that the class is overbroad for including "voluntary" payments where the consumer "agreed" to make payment; cases where no returned check fee was recovered; or other voluntary payers who spoke with TRS personnel and then agreed to a draft.  Mem. Law Opp'n at 22.  Those categories legitimately fit within the overshadowing class claim.

### *Typicality, Fed. R. Civ. P. 23(a)(3)*

LaRocque's claim is that it was illegal for TRS to engage in these collection activities during the 30 days following its RECR3 letter. That is what happened to her, and therefore, her claim is typical. The defendants oppose typicality because LaRocque never actually bounced a check. They say, therefore, that her claim is not typical of many of the proposed class members—namely, those who did bounce checks. As I said before, that may make LaRocque a more attractive plaintiff, but since her claim in this context is that the defendants' actions were illegal regardless of whether a check bounced, it does not make her claim atypical.

### *Fair and adequate representation, Fed. R. Civ. P. 23(a)(4)*

What I said under Class 1 applies here as well.

### *Predominance, Fed. R. Civ. P. 23(b)(3)*

Here, the common issues are the receipt of the RECR3 letter, an amount collected within the first 30 days, and the authority of TRS. Thus, the liability questions are all common. The individual questions regard damages—specifically, the precise amount collected from each consumer, because the plaintiff demands actual pecuniary damages for this class (not emotional distress) in addition to statutory damages.

In this circuit, "the individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." <u>Smilow</u>

v. Southwestern Bell Mobile Sys., 323 F.3d 32, 40 (1st Cir. 2003).  That is even more the case when individual facts might be ascertained using computer records and objective criteria, id., as seems likely in this case, where the defendants received consumer information electronically and then used it to produce and deliver form letters.  Moreover, the policy goals underlying Rule 23(b)(3) also support class certification in this case, where consumers seek to band together to vindicate claims that, individually, would be too small to warrant litigation.  Id; Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997).

### Superiority, Fed. R. Civ. P. 23(b)(3)

The same analysis applies here as in Class 1.  Once again, the focus will be on a uniform letter interpreted according to an objective standard, albeit in this class for those consumers across the country from whom the defendants recovered funds within 30 days of the letter.  The only individual issues will be damages (how much was the recovery).

But on the overshadowing class, the defendants make an additional argument against superiority that derives primarily from a few mass tort product liability cases.  The defendants argue that the overshadowing claim here is so novel that it should not be tried as a class action until there is a "track record" of similar but non-class-action cases reaching resolution or until an administrative agency (here, presumably the FTC) resolves it.  Mem. Law Opp'n at 33-36.  I find the argument unpersuasive.  The FDCPA statute itself contemplates class actions for its enforcement.  According to the Third Circuit:

> Congress explicitly provided for class damages in the FDCPA. Congress also intended the FDCPA to be self-enforcing by private attorney generals. Representative actions, therefore, appear to be fundamental to the statutory structure of the FDCPA. Lacking this procedural mechanism, meritorious FDCPA claims might go unredressed because the awards in an individual case might be too small to prosecute an individual action.

Weiss v. Regal Collections, 385 F.3d 337, 345 (3d Cir. 2004). And there have been many class actions litigated under the FDCPA. The question here is whether the letter and practices used by these defendants violate the statute. That is not a novel claim.[37] It cannot be that, every time a debt collector comes up with a new letter or a new practice, class actions are unavailable until either individual cases first reach resolution or the FTC rules.[38]

It is therefore appropriate to certify the second class, modified as I have described.

## C.   *Class 3:  Duplicative Collection*

This proposed class is:  All people in the United States and its territories whose paper checks were processed electronically and from whom at least one of the defendants has, since March 11, 2010, recovered a second—duplicative—payment by re-presenting the paper check to the drawer's bank.

---

[37] This is unlike In re New Motor Vehicles Canadian Export Antitrust Litigation, 522 F.3d 6, 26 (1st Cir. 2008), where the court stated that "when a Rule 23 requirement relies on a novel or complex theory as to injury, . . . the district court must engage in a searching inquiry into the viability of that theory and the existence of the facts necessary for the theory to succeed." There, the novel or complex theory was the method of proving antitrust causation, and it was key to whether common issues would predominate in the lawsuit. That is not the situation here.

[38] The defendants also point to the risk of heavy damages for emotional distress. Mem. Law Opp'n at 36 n.13. In fact, no emotional distress damages are requested in the proposed classes. See note 8 supra.

### Numerosity, Fed. R. Civ. P. 23(a)(1)

It is undisputed that the members of this proposed class number 261 people.  That satisfies the numerosity requirement.

### Commonality, Predominance, Superiority, Fed. R. Civ. P. 23(a)(2),(b)(3)

For this countrywide Fair Debt Collection Practices Act claim, the proposed class is composed of people who used checks to make a purchase, had their respective checks clear, but also paid a second time when the defendants improperly re-represented these checks.  The defendants "concede that the FDCPA does not allow duplicative collection from a check writer, and that proof of the duplicative collection may suffice to prove a class member's case in chief."[39]   Mem. Law Opp'n at 37.   Nevertheless, they say that the proposed class fails commonality, predominance, and superiority because they are asserting a statutory defense, namely:  "A debt collector may not be held liable . . . if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."   15 U.S.C. § 1692k(c).   The defendants maintain that this affirmative defense is "highly case-specific" and that resolving it for LaRocque's case will not resolve it for any other class member.  Mem. Law Opp'n at 37.  I conclude that the defendants are correct.

---

[39] The statute prohibits collection of any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  15 U.S.C. § 1692f(1).

The First Circuit has not discussed the bona fide error defense. Other circuits say that there are three requirements: "(1) The alleged violation was unintentional, (2) the alleged violation resulted from a bona fide error, and (3) the bona fide error occurred despite procedures designed to avoid such errors." Beck v. Maximus, 457 F.3d 291, 297-98 (3d Cir. 2006); accord Johnson v. Riddle, 443 F.3d 723, 729 (10th Cir. 2006) (after intent, the procedures part of the defense involves a two-step inquiry: "first, whether the debt collector 'maintained'—*i.e.*, actually employed or implemented— procedures to avoid errors; and, second, whether the procedures were 'reasonably adapted' to avoid the specific error at issue.").

I pass the question whether unintentionality is an issue common to the class. Perhaps LaRocque means to concede that all the duplicative payment violations were unintentional across the class, although she has not expressly said so.[40] But it is apparent that the error(s), bona fide or not, that result in the duplicative payment violations will vary. Here, for example, Rite Aid should have returned LaRocque's paper check, voided, to her once TeleCheck approved her check at the point of sale. Rite Aid failed to do so. Defs.' Sellen Dep. 112:20-113:15, Aug. 25, 2011 (ECF No. 45-1); Decl. Sellen Supp. Defs.' Opp'n Pl.'s Mot. Class Certification at ¶ 10 (ECF No. 46). The next mistake was that Rite Aid deposited the paper check for payment. It should not have done so. Defs.' Sellen Dep. 116:19-25, 169:20-22; Decl. Sellen at ¶ 10. Then,

---

[40] There could be no class certification if a jury must determine the issue of unintentionality for each of the 261 duplicative payments.

LaRocque's credit union lapsed in failing to recognize that the check already had been paid electronically.[41]  Id. ¶ 11.  Next, the credit union inexplicably stamped LaRocque's check "RETURN REASON A - NOT SUFFICIENT FUNDS," also incorrect.  Defs.' Sellen Dep. 117:1-118:15.  This series of missteps generated the erroneous documentation that the defendants received regarding LaRocque's transaction.  There is no reason to believe that this same scenario played out across 261 members of this proposed class in terms of the check documentation presented to the defendants.

LaRocque argues that the "error" on which to focus is the generic error: duplicative collection by re-presenting a paper check.  Perhaps.[42]  Certainly duplicative collection is the statutory violation, as the defendants concede.  But to assess their "error," whether it was "bona fide," and whether the defendants maintain procedures "reasonably adapted to avoid any such error," requires examining the underlying event(s) that culminated in the duplicative collection.  As the LaRocque transaction demonstrates, that underlying record can present a variety of circumstances.  Thus, before a factfinder can assess the procedures the defendants use upon receiving (sometimes inaccurate) check transaction records and answer the third question—whether the defendants had

---

[41] The defendants say that banks generally have safeguards to catch duplicate item errors, Mem. Law Opp'n at 37 (citing Defs.' Sellen Dep. 129:7-10), but that the bank safeguards failed here.

[42] The statute seems to separate violation from error and provides a defense for a violation that results from a bona fide error if there are procedures adapted to avoid that error.  15 U.S.C. § 1692k(c).  But some support for the plaintiff's position can be found in Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, where the Court refers to procedures to avoid "mistakes" and refers to calling a debtor at the wrong time of day and making a false representation of the amount due as mistakes, whereas these are also statutory violations.  130 S. Ct. 1605, 1614 (2010).

"procedures reasonably adapted to avoid" the error of duplicative collection[43]— the factfinder will need to know what documentation was presented to the defendants and in what respects it might have been inaccurate.   The defendants are entitled to present to the factfinder those details so that they can justify the procedures that they say are "reasonably adapted to avoid any such error"[44]  (the "specific error at issue" in <u>Johnson v. Riddle</u>'s language), and explain why those procedures failed in particular cases.[45]  That will make for an unmanageable trial for this claim with 261 class members.

As a result, beyond the fact of duplicative payments, I conclude that there is little commonality for this class, little typicality, and no superiority in class status.  A jury might find that the defendants had adequate procedures that nevertheless failed to avoid the error of duplicative collection in LaRocque's case or, on the contrary, that their procedures were not reasonably adapted to avoid such an error in LaRocque's case; but that finding should not determine the fate of rest of the class who paid twice because of unintentional errors, whatever they were.

---

[43] The defendants also argue that there was another bank error, namely, that the credit union should have recognized the TeleCheck re-presentment as invalid and refused payment, thereby preventing the duplicative payment. Mem. Law Opp'n at 9; Decl. Sellen at ¶¶ 11, 14.

[44] <u>Wal-Mart</u> recognized the defense right "to litigate its statutory defenses to individual claims." 131 S. Ct. at 2561.

[45] The defendants point to human failures that occurred in the processing of LaRocque's check within their own organizations and in how they responded to her letters.  Defs.' Sellen Dep. 162:11-24, 164:25-165:15, 224:10-225:15; Defs.' Moore Dep. 82:1-84:1, Aug. 26, 2011 (ECF No. 45-6).  They describe these as failures that stymied their institutional procedures to avoid errors.  It is unlikely that any such human failures will be uniform across the 261 class members.  Some of them, however, occurred after the duplicative collection and in connection with dealing with LaRocque's letters of complaint.  I do not decide whether those later human errors, which prevented LaRocque's reimbursement for the duplicative payment, qualify as part of the bona fide error defense.

LaRocque also argues that the Supreme Court's decision in Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, ___ U.S. ___, 130 S. Ct. 1605 (2010), makes the bona fide error defense a common issue for a class.  In the course of holding that debt collector mistakes in interpreting the law do not qualify for the bona fide error defense, the Jerman court discussed the statutory phrase "procedures reasonably adapted to avoid any such error." 130 S. Ct. at 1614.  The Court stated:

> The dictionary defines "procedure" as "a series of steps followed in a regular orderly definite way."  In that light, the statutory phrase is more naturally read to apply to processes that have mechanical or other such "regular orderly" steps to avoid mistakes—for instance, the kind of internal controls a debt collector might adopt to ensure its employees do not communicate with consumers at the wrong time of day, § 1692c(a)(1), or make false representations as to the amount of a debt, § 1692e(2).

Id. (citation omitted).  According to LaRocque, Jerman means that, to establish the defense, the defendants will have to prove standardized error-avoiding procedures, evidence that will be the same for all the duplicative payment errors.  Pl.'s Mem. at 19-20; Oral Argument Tr. 22:14–24:13.  Even if that is so (and the record does not reveal whether the defendants have a single standardized set of error-avoiding procedures[46]), the assertion does not solve the problem that the originating mistakes will differ, that a standardized error-avoiding procedure may be adequate for some but not for other mistakes, and that the human responses of the defendants' personnel, some of them failures, will also differ.  As the Ninth Circuit has stated, "The procedures themselves

---

[46] What I have is a summary description of the error-avoidance procedures of examining checks and responding to consumer claims that an item was paid.  Decl. Sellen at ¶¶ 12, 13.

must be explained, along with the manner in which they were adapted to avoid the error." <u>Reichert v. Nat'l Credit Sys.</u>, 531 F.3d 1002, 1007 (9th Cir. 2008). Other circuits concur.   <u>See</u> <u>Riddle</u>, 443 F.3d at 729 (10th Cir. 2006) ("'reasonably adapted' to avoid the specific error at issue"); <u>Wilhelm v. Credico, Inc.</u>, 519 F.3d 416, 421 (8th Cir. 2008) ("procedures 'reasonably adapted to avoid' the error that occurred . . . is a fact-intensive inquiry . . .").

Because this proposed class does not satisfy the commonality, typicality, and superiority requirements,[47] I do not address the remaining requirements for certifying the class.

## D.   <u>Class 4</u>:  *Maine Unfair Trade Practices Act and Limitation on Fee Recovery for Bad Checks*

This proposed class is:  All people who have paid a returned check fee to at least one of the defendants by way of a TRS draft in connection with an underlying check transaction that occurred in Maine since March 11, 2005.

### *Numerosity, Fed. R. Civ. P. 23(a)(1)*

It is undisputed that the members of this proposed class number 2,863 people.  That satisfies the numerosity requirement.

### *Commonality, Fed. R. Civ. P. 23(a)(2)*

This class is composed of all those who paid a returned check fee by TRS draft on a point-of-sale transaction that occurred in Maine.  The claim is, first, that TRS had no authority to collect *any* fee and, second, that the MUTPA does not allow the defendants to collect their "returned check fee" without a prior

---

[47] <u>Accord</u> <u>Villari v. Performance Computer Mgmt., Inc.</u>, No. 97 Civ. 7580(LMM), 1998 WL 414932, at *4 (S.D.N.Y. July 22, 1998) (bona fide error defense prevents class certification).

10-day notice and opportunity to pay the check, bank fees and mailing costs and thereby avoid the "returned check fee" altogether.  LaRocque claims that the $25 fee violates the MUPTA either because it is a direct violation of 14 M.R.S.A. § 6071(1)[48] or because that statute articulates Maine public policy that should inform the meaning of the Unfair Trade Practices Act as it applies to the defendants' check collection procedures here.  (Section 6071(1) concerns fee recovery in collections lawsuits, whereas these defendants used self-help rather than a lawsuit.)  The defendants disagree with the plaintiff's reading of the statutes, but the issue of what the statutes mean, permit, or require is common across the class.

The defendants also contend that there can be no MUTPA recovery unless a consumer suffers a loss and that there is no loss to those consumers who agreed to the fee by their conduct at the point of sale—namely, in proceeding with the transaction after notice of the fee.  The plaintiff responds that, whatever authority the point-of-sale circumstances granted TeleCheck, they did not extend to TRS and that, in any event, the Maine statute or public policy concerning such a collection fee prevails regardless.  Once again, those arguments and circumstances are common to the class.[49]

---

[48] That statute provides that, "[i]n any action against a person liable for a dishonored check," it is a pre-condition to recovery of costs and processing charges that the holder give the debtor ten days' notice.  LaRocque asserts that the defendants did not give consumers this notice.

[49] Both parties refer to the "substantial injury" requirement of 5 M.R.S.A. § 213 and its caselaw.  See, e.g., Anderson v. Hannaford Bros. Co., 659 F.3d 151 (1st Cir. 2011); Tungate v. MacLean-Stevens Studios, Inc., 714 A.2d 792, 797 (Me. 1998).  To the extent that the "substantial injury" requirement applies to the size of damages, I am satisfied that $25 is a substantial injury for these purposes.

### *Typicality, Fed. R. Civ. P. 23(a)(3)*

The defendants challenge typicality because they now concede that they should not have collected the fee from LaRocque, who never bounced a check. But as I have said previously, that does not prevent her from presenting the broader legal claim that the fee is illegal for all.  That claim is typical of the class.[50]   The defendants also argue that consumers who saw the TeleCheck decals or signed a receipt did authorize the $25 fee and that such is an individualized transaction-by-transaction determination.  But as I said under commonality, LaRocque argues, as with the other classes, that *TRS* had no authority regardless of the decals and that the statutory 10-day notice requirement applies regardless.  Oral Argument Tr. 25:11-18.  I do not yet determine whether she or the defendants is/are correct, but the claim is typical of the class.[51]

### *Fair and Adequate Representation, Fed. R. Civ. P. 23(a)(4)*

What I said under Class 1 applies here as well.

---

[50] The defendants also say that "the statute expressly does not displace the terms of a written agreement, 14 M.R.S.A. § 6071(3); it cannot displace an agreement to collect the $25 by demand draft, and therefore lack of authorization must be proved."  Mem. Law Opp'n at 23. Although 6071(3) does say that, I am not sure how it applies here.  For Classes 1 and 2, the defendants seemed to treat the point-of-sale circumstances as creating an express, not a written, contract.  See Mem. Law Opp'n at 12.  In any event, the statement does not change my conclusion regarding typicality:  LaRocque is asserting that the point-of-sale documents and circumstances do not overcome the statutory or policy requirements, and that argument is common to and typical of the class that she seeks to represent.

[51] To the extent that the defendants are arguing that their RECR3 letter is notice that satisfies the state law requirement, Mem. Law Opp'n at 23, that issue also is common to the class because the defendants use a uniform letter and follow a regular schedule for collecting the fee. ("TRS waits a minimum of ten to fourteen days before sending a second notice informing the check writer of the upcoming deposit of that draft."  Id. at 5.)

### *Predominance, Fed. R. Civ. P. 23(b)(3)*

The issues of the legality of the returned check fee under Maine statute and public policy and of TRS's authority predominate for this class. Individual issues will concern damages where, as I said for Class 2, First Circuit caselaw allows certification of a class.

### *Superiority, Fed. R. Civ. P. 23(b)(3)*

The same reasoning as for Classes 1 and 2 applies here as well.

It is therefore appropriate to certify the proposed fourth class.

## REMAINING ISSUES

The defendants argue that it is impossible to segregate consumer claims, which generate liability under the statutes, from non-consumer transactions, which do not qualify for recovery.  I do not find that challenge to be a disqualification to class certification.  As LaRocque points out, the defendants' Rule 30(b)(6) depositions establish that the RECR3 letter was used only for consumer transactions.  Pl.'s Reply Br. at 7.  That takes care of Classes 1 and 2.  As for Class 4 (as well as for Classes 1 and 2, if necessary), a remedy can be limited to consumer recovery with a claims administration procedure that requires applicants to establish that theirs was a consumer transaction.  That is not uncommon.  See, e.g., Ballard v. Equifax, 186 F.R.D. at 599 (E.D. Cal. 1999), 158 F. Supp. 2d 1163, 1171 (E.D. Cal. 2001).

I do have some modest concerns with the class definitions.

1.     Proposed classes 1 and 2 refer to natural persons "in" the State of Maine or "in" the United States.  It is not clear to me whether that means now,

or at the time they received the letter, or when the money was recovered, or at some other point.  I also do not know whether, by the term "in," the plaintiff means residents, or those with a mailing address in the relevant locations and to which the RECR3 letter was sent, or merely someone passing through at the relevant time.  (Proposed class 4 does not have the problem because it is limited to check transactions that occurred in Maine.)

2.      Both proposed classes 1 and 2 refer to  a letter "substantially similar in form" to the letter attached to the Complaint.  Pl.'s Mem. at 2.  What does that mean?   Are there letters other than the RECR3 letter I have considered?  The class certification argument has proceeded otherwise on the premise that there is a uniform letter.  See, e.g., id. at 26.

3.      Similarly, proposed class 4 refers to "a $25.00 returned check fee, or the same type of fee in any other amount."  Id. at 2.  What does that mean? Does TRS collect returned check fees in other amounts?  I found no reference to other figures in the record.

4.      The three classes that I am willing to certify do overlap.  But the parties have not suggested and I do not see a way to avoid the overlap at this stage.  Whether the overlap matters will depend on which, if any, of the classes obtain a liability verdict and how any overlap affects damages.  I conclude that it is premature to deal with the overlap question at this stage (and it is not even raised by the parties).

**SUMMARY**

To summarize, I am prepared to certify three classes.  The first class will test the legality of the contents of the first RECR3 letter under the Federal Debt Collection Practices Act (FDCPA) and its Maine counterpart.  The second class will test the federal overshadowing claim in TRS's (not TeleCheck's) use of the letter and the defendants' collection activities, uniformly conducted within 30 days of the letter.  The third class will test whether the defendants' recovery of a $25 returned check fee by TRS draft is legal under Maine law even with the point-of-sale notices and the RECR3 letter.  No emotional distress damages are pursued for any of the classes.  I will not certify a class for the defendants' duplicative recovery of paper checks, because the bona fide error defense available under the FDCPA prevents commonality, predominance, and superiority.

**<u>ORDER</u>**

Without prejudice to their objections to this decision, the parties shall meet and confer on the form and content of an order certifying and defining the classes to satisfy Rule 23(c)(1)(B)'s requirement that the order "must define the class and the class claims, issues, or defenses."[52]  The proposed order shall also address the concerns that I have outlined, including the Class 2 overbreadth, discussed on pp. 26-7.  If the parties cannot agree, they shall present jointly the portions on which they do agree and separately—with

---

[52] I do not believe that the plaintiff's proposed Order (ECF No. 43-1) satisfies the requirements of Rule 23(c)(1)(B).

41

support for their competing positions—the portions on which they cannot agree.  They shall do so by August 17, 2012.

The parties shall meet and confer on the form and content of a class notice that satisfies Rule 23(c)(2)(B).  The same procedures and deadlines shall be followed as in the preceding paragraph.

The order certifying  the class must also appoint class counsel.  In that connection, I exercise my authority to order that class counsel propose terms for attorney's fees and nontaxable costs, as well as record-keeping and documentation requirements, and provide me with any fee agreement that they have entered.  See Rule 23(g)(1)(C).  They shall do so by the same deadline.

SO ORDERED.

DATED THIS 17TH DAY OF JULY, 2012

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**